**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

Z.J.W., by next friends and parents, TERESA CATOE and JOHN WHEELER; and A.A.P., by next friend and parent, SUSAN PARK,

**Plaintiffs,**

**v.**

KING GEORGE COUNTY SCHOOL BOARD; DR. JESSE BOYD, in his official capacity as Superintendent of King George County Schools; and DR. CASEY NICE, in his official capacity as Principal of King George Middle School,

**Defendants.**

Case No. 3:26-cv-00775-REP

**MEMORANDUM OF LAW IN SUPPORT OF Z.J.W.'S, BY NEXT FRIENDS AND PARENTS TERESA CATOE AND JOHN WHEELER, MOTION FOR PRELIMINARY INJUNCTION**

**MEMORANDUM OF LAW IN SUPPORT OF Z.J.W.'S, BY NEXT FRIENDS AND PARENTS TERESA CATOE AND JOHN WHEELER, MOTION FOR PRELIMINARY INJUNCTION**

King George County Schools ("KGCS") has blocked a thirteen-year-old student from starting a club because school officials do not approve of what it represents. Plaintiff Z.J.W. followed every rule KGCS imposed to form a Gay-Straight Alliance ("GSA") club at King George Middle School ("KGMS"), only to watch Defendants rewrite school policy specifically to keep the club from forming and repeatedly offer to let Z.J.W. form the same club under a different name so long as it did not reference LGBTQ-based identity. That is textbook viewpoint discrimination, and it violates both the Equal Access Act, 20 U.S.C. §§ 4071–4074 ("EAA") and the First Amendment.

Plaintiff Z.J.W. seeks a preliminary injunction to form and participate in a GSA at KGMS. Z.J.W. seeks this relief against the KGCS School Board ("the Board"), KGCS Superintendent Dr. Jesse Boyd, and KGMS Principal Dr. Casey Nice under the EAA and the First Amendment.

Because the Board has singled out the GSA based on the message and viewpoint espoused by the club, Plaintiff Z.J.W. is likely to succeed on the merits of their First Amendment and EAA claims. Every day this continues, Z.J.W. loses more of their limited time left at KGMS to ever benefit from the club they fought to create and will suffer irreparable harm absent an injunction. The balance of equities and public interest favor Plaintiff Z.J.W. given the lack of any compelling interest supporting the Board's policies.

## STATEMENT OF FACTS

### I. KGCS's policies and practices prior to the 2025–2026 school year.

KGMS is a secondary school within KGCS. Pursuant to then-policy, KGCS allowed noncurricular groups at secondary schools; a number of student groups were active at KGMS when the 2025–2026 school year commenced. Declaration of Susan Park ("Park Decl.") at ¶ 31, Ex. I, Ex. J. Student groups were also active at a KGCS elementary school. Declaration of Becca Boe ("Boe Decl.") at ¶ 25, Ex. H, Ex. I.

### II. In the fall of 2025, the GSA applied to form at KGMS.

In August 2025, Z.J.W., KGMS student, sought to register a GSA as a new student group. Z.J.W. approached their homeroom teacher, Mr. David Riley, who was supportive of the club but unable to serve as its sponsor due to scheduling constraints. Declaration of Z.J.W. ("Z.J.W. Decl.") at ¶ 7. Mr. Riley suggested Z.J.W. ask Ms. Becca Boe to sponsor the club; Ms. Boe agreed and approached Dr. Nice about the requirements for club formation. Boe Decl. at ¶¶ 4–6. Dr. Nice informed Ms. Boe that he was in favor of the club's formation and presented the necessary next steps to register the club: creating a flyer, club constitution, sample calendar of activities, and interest form to be posted on the school's online learning platform, Canvas. *Id.* The GSA's stated mission was to "promote respect, understanding, and equality for all people regardless of sexual

orientation, gender identity, or expression." *Id.*, Ex. B. The constitution included education on civil rights. *Id.* Seventeen middle school students filled out the GSA interest form indicating intent to join. *Id.* at ¶ 13. Dr. Boyd noted his approval so long as the GSA was "entirely student run" with "the teacher [] in a supervisory role." Park Decl., Ex. V at 1.

## III. In response to the GSA, community backlash and an initial "pause" ensued.

Shortly after the materials were posted, some KGMS parents posted screenshots of the flyer and interest form in a Facebook group called "King George Community," which is open to residents of King George, VA. *Id*. at ¶ 5, Ex. A; Boe Decl. at ¶ 16; Declaration of John Wheeler ("Wheeler Decl.") at ¶ 9. One post garnered almost 600 comments and included many anti-LGBTQ+ comments statements such as: "Keep this garbage out of public schools" and "There are only two genders, male and female. Safe space what a joke." Park Decl., Ex. A. More aggressive and targeted posts were posted to a separate Facebook group "The Real King George Uncensored"; photos of Ms. Boe were posted and community members accused her of "grooming" children, calling for her to be fired and sending hostile emails to her work email address. *See, e.g.*, Declaration of David Riley ("Riley Decl.") at ¶ 4, Ex. A; Boe Decl. at ¶ 16, Ex. F.

In response to the backlash, Defendants put the formation of the GSA "on pause," stating that the GSA proposal "has led to division within our community." Park Decl. at ¶ 7, Ex. B; *see also* ¶¶ 49, 53, Ex. R, Ex. T at 1; Kahn Decl., Ex. 9 at 11-12.

## IV. KGCS proposed unconstitutional and illegal student group policy amendments.

Board members have raised concerns about the "age-appropriateness" of the GSA. Kahn Decl., Ex. 10 at 27. Dr. Boyd stated he believed that creating a GSA raised "red flags." *Id.* at 10. Defendants announced they would update policies to make club formation more difficult. *Id.* at 25–31, Ex. 3.

On October 22, 2025, Plaintiffs' Counsel wrote to Defendants detailing the illegality of their actions. *Id.*, Ex. 1. Defendants never responded. On November 5, 2025, Mr. Riley emailed the Board informing them that the proposed ten-interested-students requirement violated the EAA. Riley Decl. at ¶ 9, Ex. B. Before these communications, Defendants repeatedly affirmed their support of student groups at KGMS. *See, e.g.*, Kahn Decl., Ex. 3 (allowing "curriculum and non-curriculum based" student groups), Ex. 10 at 25, Ex. 11 at 24-25; Park Decl., Ex. I (Dr. Nice stating after-school clubs were allowed because KGMS values "[student] involve[ment] in activities that promote connection, leadership, and growth."). After these communications, Defendants reversed course and pivoted to prohibiting all noncurricular groups at the elementary and middle school. *See* Kahn Decl., Ex. 5, Ex. 6. The now-current student group policies limit noncurricular groups to King George High School ("KGHS"). *Id.*, Ex. 7, Ex. 8.

### V. KGCS selectively enforced amended and newly adopted student groups policies against the GSA.

Despite Defendants' attempts to paint their actions as viewpoint neutral, the differential treatment of the GSA reveals their true intentions. First, all previously existing student groups at KGMS have been allowed to continue to meet under the new policy because officials believe "The School Board approval of IGDA does not impact any existing student groups at [KGMS]." Park Decl., Ex. F at 1. These student groups include the Robotics Team, Theater Club, Beta Club, Book Club, Yearbook Club, Outdoor Club, and the Superintendent's Student Advisory Committee. There is no robotics course, yearbook-specific course, or outdoor course at KGMS. Kahn Decl., Ex. 17. Likewise, student groups at the elementary level have been formed, or otherwise continued to exist, after the policy change, including a Book Club, Card and Board Game Club, Crochet Club, STEM Club, Volleyball Club, and Chorus. Boe Decl. at ¶ 25, Ex. H, Ex. I. Principal Sandy Elia

explained that all groups continued meeting because "each club [] is designed to extend learning and provide students with a variety of ways to engage with the SOL…" Boe Decl. at ¶ 27, Ex. J.

During the 2025–2026 academic year, students also attempted to form a Fellowship of Christian Athletes ("FCA") at KGMS. Park Decl. at ¶ 57. KGMS staff stated that Dr. Nice believed the FCA did not meet the requirements of the new IGDA policy but would attempt to amend the curriculum of a leadership class to make the FCA curricular, thus allowing the club to form. *Id.*, Ex. W. Dr. Nice likewise stated he would "work with Dr. Boyd" to see about pursuing the FCA. *Id.*, Ex. X at 1. No such accommodation was offered to the GSA.

## VI. KGCS repeatedly offered to approve a GSA-equivalent club so long as it dropped any LGBTQ+-specific name or message.

Dr. Boyd and members of the Board have consistently maintained they do not believe a GSA is "appropriate" for KGMS students and have instead proposed allowing a non-LGBTQ+-specific alternative. Riley Decl. at ¶¶ 12–13; Z.J.W. at ¶¶ 12, 16; Declaration of A.A.P. ("A.A.P. Decl.") at ¶¶ 13–14. Dr. Nice mentioned the idea of forming a "PRISM Club" in lieu of the GSA to Mr. Riley. Riley Decl. at ¶ 12. Dr. Nice told Mr. Riley that, like GSAs, PRISMs promote tolerance and acceptance of LGBTQ+ people but don't include references to those identities in their name. *Id.* Dr. Nice said he thought this might be more palatable to the Board. Dr. Nice also proposed this directly to Dr. Boyd. Park Decl., Ex. Y.

Shortly thereafter, in November 2025, Dr. Boyd spoke with Mr. Riley and expressed that the Board would likely never allow KGMS students to form a club that referenced LGBTQ+ issues in its name or mission. Riley Decl. at ¶ 13. Mr. Riley mentioned Dr. Nice's proposal of a PRISM, but Dr. Boyd stated that while it would be more "palatable" to the community, it was still probably too controversial because it was connected to LGBTQ+ topics. *Id.* Dr. Boyd suggested that if the

students instead proposed a club focused on tolerating all people it would likely be approved by the Board. *Id*.

Even more telling, Dr. Nice stated that,

> [] I believe that if a club were proposed, such as a Kindness Club or a similar organization, that aligns with the underlying intent of the GSA without engaging in discussions related to sexuality or LGBTQ topics, the School Board may be more receptive to considering a future revision of Policy IGDA to allow nonacademic clubs at KGMS. Framing the focus around supporting students' sense of belonging at the middle school level, rather than around specific issues or labels, may make the proposal more approachable for some board members.

Park Decl. at ¶ 43, Ex. O. Similarly, in 2026, during a meeting with Ms. Catoe and Ms. Park, Dr. Boyd said the GSA pertained to a "very divisive topic," and that the Board would be more likely to "go for" a "Safe Space Group." *Id.* at ¶ 61. Dr. Boyd and Dr. Nice also conveyed this offer directly to Z.J.W. and A.A.P. during an in-person meeting in or around January 2026. Z.J.W. Decl. at ¶ 16; A.A.P. Decl. at ¶ 26.

All pre-existing student groups within KGCS continued to operate through the end of the 2025–2026 academic year as they had prior to the policy change, but the GSA was not allowed to form and has not been allowed to meet through the present. The GSA, unlike the other student groups, continues to face discriminatory enforcement of the new policy to date. Z.J.W. continues to seek to form and join the GSA at KGMS and hopes to have a GSA established by the beginning of eighth grade in August 2026, the last opportunity to benefit from the club before leaving KGMS.

## LEGAL STANDARD

Plaintiffs seeking preliminary injunctive relief must establish (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 20 (2008)). To satisfy the first factor, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (internal quotation marks omitted). "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "[T]he burdens at the preliminary injunction stage track the burdens at trial," and, for First Amendment purposes, the government has the burden to show at the preliminary injunction stage that it can justify its policies. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *see also Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

Injunctions to protect First Amendment rights are always in the public interest. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002). When the government is the defendant, the balance of equities and the public interest analyses merge. *Vitkus*, 79 F.4th at 368. The same is true under the EAA. *Boyd*, 258 F. Supp. 2d at 692 ("Just as constitutional violations … the exoneration of any [EAA] violations … would serve to satisfy the public interest requirement … [and i]t is always in the public interest to prevent the violation of a party's constitutional rights.").

## ARGUMENT

### I. Plaintiff Z.J.W. is likely to prevail on the merits of their Equal Access Act claim.

The EAA prohibits federally-funded public secondary schools that have created "limited open forum[s]" from "deny[ing] equal access or a fair opportunity to, or discriminat[ing] against any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a).

Under the EAA, equal access extends to all student groups. *See Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 259 (1990) (Kennedy, J., concurring) ("*Mergens*") (the EAA requires "official recognition" of student groups even of "a most controversial character . . . [where] in the past [schools would] have given official recognition only to clubs of a more conventional kind."); *see also Colin ex rel. Colin v. Orange Unified Sch. Dist.*, 83 F. Supp. 2d 1135, 1142, 1147–49 (C.D. Cal. 2000); *Straights & Gays for Equal. v. Osseo Area Schs.–Dist. No. 279*, 471 F.3d 908, 912–13 (8th Cir. 2006) [hereinafter *SAGE*]; *Gonzalez v. Sch. Bd. of Okeechobee Cnty.*, 571 F. Supp. 2d 1257, 1262 (S.D. Fla. 2008). The EAA authorizes grants of injunctive relief. *See Student Coal. for Peace v. Lower Merion Sch. Dist. Bd. of Sch. Dirs.*, 776 F.2d 431, 441 (3d Cir. 1985) ("[A]ppellants may maintain a private cause of action for an injunction under the Equal Access Act"); *see, e.g., Mergens*, 496 U.S. at 226.

**A. The Equal Access Act applies to KGMS's student groups.**

The EAA applies to all "public secondary school[s] which receive[] Federal financial assistance and which [have] a limited open forum." 20 U.S.C. § 4071(a). KGCS receives federal funding. Kahn Decl., Ex. 22, Ex. 23. KGMS also satisfies the other two criteria under the EAA.

*i. KGMS is a public secondary school for the purposes of the EAA.*

Under the EAA, a "secondary school" is defined as any "public school which provides secondary education as determined by State law." 20 U.S.C. § 4072(1). While Virginia law does not use the term "secondary education," its statutes make clear that middle schools are grouped with high schools as "secondary schools" under state law. The statute establishing Virginia's public school system divides all public schools into the binary categories of "elementary" and "secondary," defining "Elementary and secondary" (and "elementary or secondary") to "include elementary, middle, and high school grades." Va. Code Ann. § 22.1-1 (2025). This is the first of multiple places where the statute lists "elementary" and "middle" as distinct parts of the same list;

"[m]iddle school" is also defined as a school that "might be housed at elementary or high schools," indicating that the term "elementary" cannot be intended to include "middle." *Id.* Because "elementary and secondary" together covers every grade level—elementary, middle, and high school—and "middle" is distinct from "elementary," middle school grades must fall within "secondary." Middle schools therefore qualify as "secondary school[s]" under Virginia law.[1]

Even KGCS follows this categorization; on its website, the principal of KGMS is grouped with the principal of KGHS as reporting to the "Supervisor of Secondary Instruction and Related Materials," while the principals of KGCS' elementary schools report to the "Supervisor of Elementary Instruction and Related Services." Kahn Decl., Ex. 16. The website acknowledges KGMS and KGHS provide "secondary level lessons" as opposed to the KGCS elementary schools' elementary level version of these lessons. *Id.*, Ex. 21. The provision of "secondary education" required for EAA coverage is best understood as the education offered by "secondary schools," and Virginia law establishes that middle schools like KGMS are categorically covered by the EAA.

Even if Virginia law did not categorically treat middle schools as providing secondary education, the EAA would apply to KGMS because KGMS offers high-school level classes. If secondary education applies to any level of instruction, it must apply to high school classes. *See, e.g.*, *Carver Middle Sch. Gay-Straight All. v. Sch. Bd. of Lake Cnty.*, 842 F.3d 1324, 1333 (11th Cir. 2016). In *Carver*, the Eleventh Circuit held that the EAA applied to a middle school that offered high-school level courses even where Florida state law lacked a clear "secondary education" definition encompassing middle schools. *Id.* at 1331–32. The court held that because the operative

[1] Further supporting this interpretation is the fact that "elementary," as defined in the statute, "includes kindergarten." Va. Code Ann. § 22.1-1 (2025). Therefore, standalone middle school cannot be considered elementary and must logically fall under the "secondary" branch of the binary statutory framework.

term in the EAA is "secondary education" and not "secondary school," the statute applies to any schools offering high school courses. *Id*. at 1332. The KGMS Program of Offerings lists "high school credit-bearing courses taken in middle school," including World History I, Algebra I, Geometry, Spanish, and French. *Id.*, Ex. 20 at 46. KGMS thus offers secondary education.

*ii. KGMS has established a limited open forum*.[2]

A school creates a "limited open forum" under the EAA whenever "such school grants an offering to or opportunity for one or more noncurriculum related groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(b);[3] *see also Mergens*, 496 U.S.at 236 (once "one 'noncurriculum related student group'"[4] is allowed "to meet, the [Equal Access] Act's obligations are triggered"). Once a public school creates a limited open forum, it must then provide all student groups with "equal access" to that forum. 20 U.S.C. § 4071(a).

As the Supreme Court held in *Mergens*, Congress intended a "low threshold for triggering the Act's requirements," such that the term "noncurriculum related student group" should be "interpreted broadly to mean any student group that does not *directly* relate to the body of courses offered by the school." 496 U.S. at 239–40. Accordingly, to be "curricular," a student group must "directly relate" to the courses offered. *See id*. A group is not curricular merely because it has "a tangential or attenuated relationship to courses offered by the school" or "remotely relate[s] to abstract educational goals" such as good citizenship or critical thinking. *Id.* at 238, 244. A student

[2] Note that the EAA's "limited open forum" analysis is distinct from the "public forum" analysis performed under the First Amendment and discussed in Argument Section II, *infra*. While the two standards have substantial overlap, the former derives from the statutory language of the EAA and the latter from the Free Speech Clause of the First Amendment to the U.S. Constitution. *See Mergens*, 496 U.S. at 242.

[3] The EAA defines "noninstructional time" as "time set aside by the school before actual classroom instruction begins or after actual classroom instruction ends." 20 U.S.C. § 4072(4).

[4] Courts use the terms "noncurriculum related" and "noncurricular" interchangeably for purposes of the EAA. No difference in meaning is intended by Plaintiff's use of either term.

group is "curricular" under the EAA only if (a) "the subject matter of the group is actually taught, or will soon be taught, in a regularly offered course"; (b) "the subject matter of the group concerns the body of courses as a whole"; or (c) "participation in the group results in academic credit." *Id*. at 239–40. "Allowing [] a broad interpretation of 'curriculum-related' would make the [Act] meaningless" and "[a] school's administration could simply declare that it maintains a closed forum and choose which student clubs it wanted to allow by tying the purposes of those student clubs to some broadly defined educational goal." *Id.* at 244–45 (internal quotation marks omitted).

In determining whether a student group is curricular, the Supreme Court in *Mergens* employed a substance-over-form analysis, stating that trial courts should look at a school's actual practice rather than its stated policy. *Id*. at 246. Applying this standard, courts have found a wide variety of student groups are noncurricular. *See, e.g., id.* at 245–46 (chess club and scuba diving club); *Boyd*, 258 F. Supp. 2d at 685–88 (Beta Club, Drama Club, Bible Club, and Junior and Senior Executive Councils); *Colin*, 83 F. Supp. 2d at 1143–45 (rejecting the school district's argument that a proposed Gay-Straight Alliance was curriculum-related because it purportedly overlapped with Health, Biology and Life Sciences, and Family Planning courses); *id.* at 1143 (finding, based on the schools' actual course content, that the Asian Club, Black Student Union, Chess Club, Christian Club, Earth Club, Eighties Club, Girls' League, Koinonia (for Catholic students), Juggling Club, Mountain Bike Club, Red Cross/Key Club, and Ski Club were noncurricular). Courts have found that even student groups *required* by the school district and state guidelines may still be noncurricular. *See Garnett v. Renton Sch. Dist*., 772 F. Supp. 531, 534 (W.D. Wash. 1991), *rev'd on other grounds*, 987 F.2d 641 (9th Cir.1993), *cert. denied*, 510 U.S. 819 (1993), *on remand*, No. CV-87-1294, 1994 WL 555397 (W.D. Wash. Sept. 14, 1994). In *Garnett*, the court held a business club was noncurricular despite school district and state guidelines requiring that

the club be offered. *Id*. The court reasoned that the *Mergens* curriculum-related factors were not met because students enrolled in business classes were not required to attend club meetings and no academic credit was awarded for participating in the club. *Id*.

Defendants have established a limited open forum at KGMS by "grant[ing] an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(b). The noncurricular groups offered at KGMS meet the EAA's "low threshold for triggering the Act's requirements." *Mergens*, 496 U.S. at 240. KGMS has allowed multiple noncurricular groups to meet on its premises during noninstructional time. These groups do not "directly relate" to the body of courses offered at KGMS as is required of any curricular group. *See id.* at 239. While some of the groups may "remotely relate[] to abstract educations goals" they, at most, have a "tangential or attenuated relationship to courses" offered at KGMS. *Id.* at 238, 244. Accordingly, the below KGMS student groups fail to meet the three-prong *Mergens* test for curricular groups. And, in accordance with the substance-over-form analysis set out in *Mergens*, the fact that KGCS has amended its policy to supposedly exclude noncurricular groups at KGMS has no bearing on whether the groups Defendants permitted to continue meeting were curricular.

1. <u>Yearbook Club</u>

The KGCS 2025–2026 yearbook includes a photo and description of the KGMS Yearbook Club. Park Decl., Ex. K. According to the description:

> This was the first year for KGMS to have a Yearbook Club! These students took photos at various events including sports and activities during and after school. They contributed ideas for yearbook content, theme, layout and design! The students proofed pages, people photos and overall helped contribute to a wonderful book of memories for KGMS students and staff to look back on in the years to come!

*Id*. KGMS's Program of Study does not include a "yearbook," photography, or "layout and design" course. The Yearbook Club falls squarely within the definition of noncurricular groups set forth in *Mergens*, *Boyd*, and *Colin*.

2. Book Club

The KGMS Book Club is listed on the official KGMS website and in the KGCS 2025-2026 yearbook. *See* Kahn Decl., Ex. 18. The KGMS website states "This club is voluntary! You may participate month-by-month, choosing which book selections interest you. There will be 8 titles from different genres. You simply read the book, come to the meeting, and earn a book bead for your 'brag tag' keychain. Participation is limited to 30 students." *Id.*

There is no indication that the Book Club includes substantive analysis of "literary elements" or focus on the "writing process," as required by KGMS English courses. *Id.*, Ex. 17. Instead, the Book Club has, at most, a tangential or attenuated relationship to KGMS English courses; it asks only that students "simply read the book" before club meetings, at which they "discuss the book and enjoy snacks together." Park Decl., Ex. K. For the reasons articulated above, the Book Club meets the "low threshold" of a noncurricular group.

3. Beta Club

The KGMS Beta Club is listed on the official KGMS website and within the KGCS 2025–2026 yearbook. The KGCS 2025–2026 yearbook describes the Beta Club's activities as:

> Beyond [Beta Club Leadership Summit and State Convention] competitions, Beta members dedicated themselves to service, completing thousands of hours supporting animal welfare, civic efforts, schools, and the elderly. . .. Through leadership, character, achievement, and service, the KGMS Beta Club truly lived out the Beta motto this year — making a meaningful impact on both their school and community.

Park Decl., Ex. K. The Beta Club is fundamentally a community service club, which courts have repeatedly deemed to be noncurricular. *See, e.g.*, *Mergens*, 496 U.S. at 241 (community service

club is example of a noncurriculum related student group); *Boyd*, 258 F. Supp. 2d at 687 (Beta Club is "a [noncurricular] community service club"). Like the KGMS Yearbook and Book Club, any connection of the Beta Club to KGMS curriculum is tangential and attenuated.

4. Outdoor Club

The KGMS Outdoor Club has existed at KGMS since 2011. Riley Decl., Ex. D. Its mission is to "educate our young people about conservation, wildlife, fisheries, hunting, fishing and how to enjoy outdoor pursuits safely and ethically." *Id*. The Outdoor Club regularly meets on KGMS's premises during noninstructional time, with on-campus activities including, "Hunter Ed." lessons, processing a deer, making turkey calls, learning how to skin small game, hosting external speakers, and making fishing lures during lunch. *Id.*; *see also id.* at ¶ 19. After IGDA was amended, the Outdoor Club sent faculty-wide email announcements requesting donations. *Id.* at ¶ 19, Ex. C.

Outdoor pursuits are not actually taught nor soon to be taught at KGMS; the Outdoor Club's subject matter does not concern the body of KGMS courses as a whole; and participation in the Outdoor Club is not required for a particular course. *See* Kahn Decl., Ex. 17. KGMS's Program of Study does not include courses on hunting, fishing, or other outdoor-related activities. *Id*. Thus, the Outdoor Club is a noncurricular group at KGMS.

5. Robotics Team

The KGMS Robotics Team is described as a club in which "students work collaboratively as they plan, experiment, and refine their robot designs. *Id.*, Ex. 18. Members engage in "critical thinking, creative problem solving, communication, and teamwork [and] learn how to troubleshoot challenges, test new ideas, and improve their robot's performance across different missions." *Id*. A KGMS science course that "introduce[s]" students to "robotics and how robotics and computer science are related," does not meet *Mergens*' requirements. *Id.*, Ex. 17. Like KGMS's other

noncurricular student groups, characterizing the Robotics Team as curricular because of a course's "introduction" would make the EAA "meaningless." *Cf. Mergens*, 496 U.S. at 238.

6. Superintendent's Student Advisory Committee

Finally, the KGCS 2025–2026 yearbook lists the Superintendent's Student Advisory Committee amongst its student groups. Park Decl., Ex. K. The Committee is described as an opportunity wherein "students shared thoughtful insights on the ways to improve their schools, highlighted things they were proud of in their school communities, and provided valuable insight into the perspectives and experiences across KGCS" where "student leaders us[e] their voices to make our schools even better." *Id*. This group, like the Junior and Senior Executive Councils found to be noncurricular in *Boyd*, concerns no subject matter that is actually taught or soon to be taught; it does not concern the body of courses as a whole at KGMS; and participation in the group is not required for a particular KGMS course. *See* Kahn Decl., Ex. 17; *Boyd*, 258 F. Supp. 2d at 687 (finding Junior and Senior Executive Councils noncurricular because their activities—prom preparation and class ring selection, and planning the senior trip, talent show, and senior t-shirts—bore no relation to curriculum). Because the Committee's focus on student wellbeing and school improvement is not tethered to any particular academic subject matter, it does not "concern[] the body of courses as a whole." *See id.* at 239, 244 (rejecting reliance on "abstract educational goals"). Thus, it is also a noncurricular group.

For the reasons stated above, KGMS has established a limited open forum through an array of noncurricular groups including, the Yearbook Club, Book Club, Beta Club, Outdoor Club, Robotics Team, and Superintendent's Student Advisory Committee.

**B. Defendants "den[ied] equal access or fair opportunity to, or discriminate[d] against" Plaintiff Z.J.W. in violation of the EAA by refusing to allow the GSA to form.**

The EAA prohibits covered schools from "deny[ing] equal access or a fair opportunity to, or discriminat[ing]" against student groups in a limited open forum. 20 U.S.C. § 4071(a). These are three independent grounds for liability, any one of which is sufficient to establish a violation. Because Defendants have established a limited open forum, they may not deny equal access to, fair opportunity to, or discriminate against Plaintiff Z.J.W., as set forth below.

*i. Defendants denied Plaintiff Z.J.W. equal access to KGMS's limited open forum.*

Denial of official recognition—including a covered school's refusal to permit the formation of a student group—is a denial of equal access under the EAA, particularly where recognition permits a student group to access concrete benefits provided by the school. *See Mergens*, 496 U.S. at 247; *see also id.* (holding that denial of a request to form a Christian club denied plaintiffs "equal access" under the Act); *Prince v. Jacoby*, 303 F.3d 1074, 1082–83 (9th Cir. 2002) (holding that denial of official recognition—and its associated benefits such as access to the school newspaper, bulletin boards, and public address system—to some but not all noncurricular groups violated the EAA); *Pope by Pope v. E. Brunswick Bd. Of Educ.*, 12 F.3d 1244, 1256 (3d Cir. 1993) (concluding that school board's failure to recognize Bible Club violated EAA when it recognized other noncurricular groups). Federal courts have consistently extended this rule to denials of official recognition for GSAs. *See, e.g., SAGE*, 471 F.3d at 916 (holding that a school board's refusal to grant official recognition to a GSA violated the EAA); *Gay-Straight All. of Yulee High Sch. v. Sch. Bd. of Nassau Cnty.*, 602 F. Supp. 2d 1233, 1238 (M.D. Fla. 2009) (same); *Gonzalez*, 571 F. Supp. 2d at 1267 (same); *Boyd*, 258 F. Supp. 2d at 688, 691 (finding strong likelihood of a violation of the EAA where official recognition was withheld from GSA but granted to other noncurricular

groups); *Colin*, 83 F. Supp. 2d at 1149 (concluding that a school cannot selectively bar a GSA's formation once a limited open forum exists).

"Equal access" has been defined broadly by courts; for example, denying use of the school newspaper, bulletin boards, and public address system all violate the equal access requirement under the Act. *See Prince*, 303 F.3d at 1082–83. Defendants have denied equal access to Plaintiff Z.J.W. by singling out the GSA and treating the club differently than other student groups. All existing student groups at KGMS, as well as student groups at Sealston Elementary School, have been allowed to continue existing and have not been scrutinized by the Board. Just as in *Mergens*, *Prince*, *Pope*, *SAGE*, *Gay-Straight All. of Yulee High Sch.*, *Gonzalez*, and *Boyd*, Defendants have allowed other noncurricular student groups at KGMS to form, meet, and otherwise access the campus and its benefits, such as the school newspaper, bulletin boards, and public address system. *See Prince*, 303 F.3d at 1082–83. Defendants have not afforded the GSA this same "equal access." These student groups, which include a Book Club, Outdoor Club, Yearbook Club, Robotics Team, Beta Club, and Superintendent's Student Advisory Committee, have all been treated more favorably than the proposed GSA. Defendants have designated other student groups as curricular using a broad definition of the term while holding the GSA to a different standard. For example, Defendants have designated the Robotics Team as curricular merely because a computer science course "introduces" robotics and its connection to computer science; conversely, Defendants did not designate the GSA as curricular despite being sponsored by the civics teacher and its mission including education on civil rights. Defendants' efforts to prevent the GSA from forming while permitting all other student groups to continue to operate without modification denied Plaintiff Z.J.W. equal access to the GSA in violation of the EAA.

*ii. Defendants denied Plaintiff Z.J.W. a fair opportunity to form the GSA.*

The EAA also independently prohibits denying "fair opportunity" to meet within a limited open forum. 20 U.S.C. § 4071(a). The proposed GSA satisfied every requirement the EAA imposes on student groups seeking to meet in a limited open forum: its meetings were to be voluntary and student-initiated, it was not to be sponsored by the Board or any of its employees, and its meetings were to be student-led. *See id.* § 4071(c). Despite the GSA satisfying these requirements, Defendants paused its formation indefinitely, rewrote school policy to exclude it, and repeatedly offered to approve the club only if it dropped any reference to its LGBTQ-based identity. Each of these actions denied Plaintiff Z.J.W. the same fair opportunity to form and meet that Defendants have afforded to every other student group at KGMS.

Moreover, a school is deemed to offer a "fair opportunity" only where it applies these criteria uniformly to all student groups. *See Mergens*, 496 U.S. at 236. Defendants did not do so here. Rather than applying the informal, principal-level approval process that governed existing clubs, Defendants proposed a new ten-student minimum specifically in response to the GSA's formation—one they abandoned only after being warned it violated the EAA, not for any legitimate reason—and shifted decision-making authority to Board-level review, with final revocation authority vested solely in the Superintendent. These heightened, GSA-specific barriers, imposed only after and only because of the GSA's attempted formation, independently confirm that Defendants denied Plaintiff Z.J.W. the same fair opportunity to organize that other KGMS students have enjoyed.

*iii. Defendants discriminated against Plaintiff Z.J.W. by denying recognition of the GSA based on its name and viewpoint.*

Discrimination under the EAA includes "harassment or unequal penalties, as well as clearcut denial," all of which "constitute a violation of the law." *Prince*, 303 F.3d at 1081 (referencing the

legislative history of the EAA). Defendants discriminate when denying a GSA recognition based on the name choice of "Gay-Straight Alliance." *See Gay-Straight All. of Yulee High Sch.*, 602 F. Supp. 2d at 1236–37. Schools also violate the EAA when they require a GSA to change its name to remove "gay" from the club's title. *See Colin*, 83 F. Supp. 2d at 1147–48. In *Colin*, the court held that school officials could not require a GSA to change its name to "Tolerance Club," "Acceptance Club," or "Alliance," noting that when passing the EAA, Congress "did not pass . . . an 'Access for All Students Except Gay Students Act.'" *Id.* at 1139, 1147–48. The court recognized that the name a student group selects implicates its speech and association rights; because the group's core mission was to address harassment against gay students, its name was paramount to its mission. *Id.* at 1147–48. Defendants have discriminated against Plaintiff Z.J.W. by requiring a name change for the GSA to form and meet. "Respect, understanding and equality" for people of all sexualities is central to the KGMS GSA's mission. Defendants cannot condition recognition of a student group on changing its name from a GSA to a "Tolerance Club," "Acceptance Club," "Alliance," *see id.*, or, as proposed here, "Safe Space Club" or "Kindness Club." No other student groups at KGMS have been asked to change their names.

Most tellingly, Defendants have repeatedly confirmed that the GSA's only obstacle is its name and LGBTQ-specific message, not its substance. KGMS administrators offered to treat a Fellowship of Christian Athletes group as curricular so that it could satisfy the new club policy but extended no comparable accommodation to the GSA. Instead, Defendants told Z.J.W. and A.A.P. that the same club would be approved if it dropped any reference to LGBTQ-based identity and instead adopted a name like "Safe Space Club" or "Kindness Club." Defendants even indicated the Board might revise the newly adopted IGDA policy itself to accommodate a "Kindness Club" that omitted any LGBTQ reference. This repeated insistence that Z.J.W. rename the club—while

asking nothing of any other student group—is direct evidence that Defendants' denial was discriminatory and tied to the GSA's message, not merely incidental to it. *See id.* (denial of GSA recognition based on its name and mission to address LGBTQ harassment); *see also Gay-Straight All. of Yulee High Sch.*, 602 F. Supp. 2d at 1236–37 (EAA violated where recognition was denied because club was named Gay-Straight Alliance). That the Board has signaled openness to a functionally identical club under a sanitized name confirms that its opposition rests on the content of the GSA's message, not any legitimate, content-neutral concern.

Defendants' newly adopted policies are pretextual attempts to mask their disapproval of the GSA's message. The multiple policy changes between September 18, 2025—when the GSA was first "paused"—and November 17, 2025, underscore Defendants' content-based, discriminatory motives: rather than settling on a principled standard for club formation, Defendants repeatedly rewrote the rules in response to legal pressure while the GSA remained excluded throughout.

### C. Defendants' denial of equal access and fair opportunity and discrimination against Plaintiff Z.J.W. was based on the content of the GSA's speech.

The final element of an EAA violation is that the denial of equal access or fair opportunity or discrimination against the students must be "on the basis of the religious, political, philosophical, or other content of the speech at [student] meetings." 20 U.S.C. § 4071(a). A school acts "on the basis of" content when it would not have imposed the same restriction had the student group's meetings addressed different subject matter. *See, e.g., Mergens*, 496 U.S. at 247 (holding that denying student request to form a Christian club violated the EAA); *Garnett*, 987 F.2d at 645–46 (finding EAA violation where record suggested Bible club was excluded because of its religious content and school officials expressed concerns about religious meetings). A student group need not actually meet in order to qualify for this prong; denial of equal access or fair opportunity or discrimination against a student on the basis of a club's identity or the type of content it intends to

address is sufficient. *See Mergens*, 496 U.S. at 247 (holding that denying student request to form a Christian club violated the EAA).

Discrimination on the basis of content is evident where a student group is restricted explicitly because of its name or message; for example, in *Gay-Straight All. of Yulee High Sch.*, the court found students had been discriminated against because the denial of the club centered on its name including the word "gay," reasoning the name was directly tied to the student group's content. 602 F. Supp. 2d at 1236–37; *see also Colin,* 83 F. Supp. 2d at 1147–48 (establishing that the GSA, the name of which was directly tied to its mission of addressing gay harassment, was the only proposed student group that had been asked to change its name). Here, Defendants offered students the opportunity to form an alternative club, such as a "Kindness Club," to fulfill the same purpose, as long as the club did not reference any LGBTQ-based identity. *See, e.g.*, Park Decl., at ¶¶ 43, 59–61, Ex. O; Z.J.W. Decl. at ¶¶ 12, 16; A.A.P. Decl. at ¶¶ 13–14, 26; Boe Decl., Ex. G. This offer establishes the GSA's denial was based in part on inclusion of "gay" in the club's name, and thus directly tied to its message. Dr. Nice separately stated the Board may even amend the revised IGDA club policy if the students seeking to form the GSA instead sought to form a club with a name like "Kindness Club." Riley Decl. at ¶ 13; Park Decl., Ex. O.

While the EAA does not require a showing of "proof of a discriminatory motive on the part of the school district" to establish a denial of "access and opportunity"; nonetheless, such motive "could be important to a finding of discrimination." *Prince*, 303 F.3d at 1081 (citations and quotations omitted). Here, Defendants have made apparent that the initial denial of the GSA was because of the group's intended message and the community backlash. Thus, Plaintiff Z.J.W. has met the requirements to prevail on the merits of their EAA claim.

**II. Plaintiff Z.J.W. is likely to prevail on the merits of their First Amendment claim.**

Defendants are violating the Plaintiff Z.J.W.'s First Amendment Free Speech rights by excluding the GSA from a limited public forum on the basis of its views. When the government opens public property to private expression, any restrictions placed on private speech must comply with the First Amendment. *Rosenberger v. Rector and Visitors of Univ. of Va*., 515 U.S. 819, 828–29 (1995). When the government singles out specific ideas for suppression, or when it imposes restrictions that are unreasonable in light of the purpose of the government property, courts are required to intervene. *Id.* at 829 (government "must abstain" from viewpoint discrimination).

When a public school opens its facilities to student-led groups during noninstructional time, it creates a "limited public forum."[5] *See Mergens*, 496 U.S. at 235. While a school board may restrict speech based on general topic categories within a limited public forum, its restrictions must satisfy a two-part constitutional minimum: the restriction must (1) "not discriminate against speech on the basis of viewpoint" and (2) be "reasonable in light of the purpose served by the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001) (internal quotation marks omitted); *see also Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) ("In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." (citation omitted)). Defendants do not meet these requirements here.

---

[5] The confusion in the courts concerning different the labels for First Amendment public fora has been referred to by the Fourth Circuit as a "morass." *White Coat Waste Project v. Greater Richmond Transit Co*., 35 F.4th 179, 196 n.13 (4th Cir. 2022). Following the Supreme Court in *Rosenberger* and other sources, Plaintiff will refer to the after-school student group forum as a "limited public forum" but acknowledges that many courts no longer distinguish between limited and nonpublic fora.

**A. KGCS has created a limited public forum.**

In the First Amendment context, a limited public forum is created as a forum specifically for private speech by a limited group of speakers or on a limited set of topics. *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 196 (4th Cir. 2022). Schools "establish limited public forums by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (internal quotation marks and citation omitted) (discussing limited public forums within the university setting). A school's student group program is an example of a limited public forum. *See, e.g., Rosenberger*, 515 U.S. at 829–30 (university student-activity-fund program); *Good News Club*, 533 U.S. at 107–08 (after-hours public-school facilities-use program).

The limited public forum created here allows students to use school facilities and access school resources but has not otherwise articulated a coherent purpose for the program. The approved student groups span a wide range of missions—from yearbook and robotics to outdoor recreation and district advisory roles, evidencing KGCS's. intent to open the forum to any student group that wishes to meet. The nature of a limited public forum is defined by the government's actual policy and practice, not merely its stated intentions. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985) (courts look to "the policy and practice of the government" to determine whether it has designated a limited public forum); *see also Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 383 (4th Cir. 2006) (explaining that it is "what the government does," not its "self-serving statements," that determines the nature of a forum). Because Defendants have continued to permit these noncurricular groups to meet at Sealston Elementary School, and a number of groups at KGMS, KGCS has created a limited public forum in practice regardless of IGDA's stated policy.

Having created this limited public forum, KGCS may only restrict a student group's access if the restriction is viewpoint-neutral and reasonable. That is not what has occurred.

### B. Defendants discriminated against Plaintiff Z.J.W.'s speech on the basis of viewpoint.

The First Amendment, applicable to state actors through the Fourteenth Amendment, prohibits the government from engaging in viewpoint discrimination. U.S. Const. amend. I. Viewpoint discrimination is "presumed impermissible" in a limited public forum. *Rosenberger*, 515 U.S. at 829–30. A facially neutral policy violates the First Amendment if it is "in fact based on the desire to suppress a particular point of view," *Cornelius*, 473 U.S. at 812, or authorizes "actual viewpoint discrimination" in practice, *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565 (2011). Such discrimination occurs when a speaker is favored over another based on the messages they seek to convey. *St. Michael's Media, Inc. v. The Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 357 (D. Md. 2021), aff'd, No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd*, No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (citations omitted). Public school officials engage in unconstitutional viewpoint discrimination when their actions are motivated by the "ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829.

A public school engages in viewpoint discrimination when it extends recognition, funding, or other benefits to some student groups but withholds them from a disfavored group. *See Healy v. James*, 408 U.S. 169, 187–88 (1972) (holding that a state college could not deny official recognition to a student group based on disagreement with the group's philosophy, placing burden on school to justify any nonrecognition); *Good News Club*, 533 U.S. at 107–12, 115–19 (finding unconstitutional viewpoint discrimination when a public school division denied an after-school student club access based on the club's religious nature). In *Widmar v. Vincent*, the Court applied the *Healy* principle to a limited-public-forum setting. 454 U.S. 263, 269-70, 276–77 (1981)

(holding that once a university opened its facilities to student groups, it may not exclude a group because of the content of its speech absent a compelling justification). The Fourth Circuit has likewise enforced this rule. *See Gay All. of Students v. Matthews*, 544 F.2d 162, 165–67 (4th Cir. 1976) (ordering public university to grant Gay Alliance of Students the same recognition and access afforded to other registered groups where the school had withheld recognition because of the GAS's advocacy); *Child Evangelism Fellowship of Md.*, 457 F.3d at 383–85 (finding viewpoint discrimination where school allowed secular groups but excluded religious groups within limited public forum.

Defendants have banned the GSA "because of the group's viewpoint." *See Martinez,* 561 U.S. at 683 n.15 (citing *Healy*, 408 U.S. at 187). Even if current IGDA and IGDA-R.2 are facially neutral, they nonetheless constitute viewpoint discrimination because they are "based on the desire to suppress a particular point of view" espoused by the GSA. *See Cornelius*, 473 U.S. at 812. That Defendants would treat the GSA differently based on its name further indicates that Defendants have singled out Plaintiff Z.J.W.'s LGBTQ-supportive viewpoints for exclusion.

Defendants have favored other speakers and their messages over Plaintiff Z.J.W. *Cf. St. Michael's Media, Inc. v. Mayor and City Council of Baltimore*, 566 F. Supp. 3d 327, 367–68 (D. Md. 2021). Defendants engaged in viewpoint discrimination by allowing other student groups at KGMS and Sealston Elementary School to meet through the end of the 2025–2026 school year while prohibiting the GSA from meeting to-date. *See supra* Section II.A.ii; *see also* Park Decl., Ex. U; *cf. Sorrell*. 564 U.S. at 565. Defendants engaged in viewpoint discrimination by extending recognition or other benefits to those other student groups while withholding them from the GSA. *Cf. Rosenberger*, 515 U.S. at 830–31; *Widmar*, 454 U.S. at 269–70, 276–77 (applying *Healy*

principle to limited-public-forum setting); *Good News Club*, 533 U.S. at 107–10 (finding viewpoint discrimination where school denied group access based on its viewpoint).

Defendants' actions thus constitute viewpoint discrimination and, on that basis alone, violate the First Amendment's Free Speech Clause. *See Good News Club*, 533 U.S. at 107 ("Because the restriction is viewpoint discriminatory, we need not decide whether it is unreasonable in light of the purposes served by the forum").

### C. Defendants' restriction is unreasonable in light of the purpose served by the forum.

Defendants' restrictions on the GSA also violate the First Amendment for the independent reason that they are unreasonable in light of the purpose of the forum. *Cf. Cornelius*, 473 U.S. at 806. The defendant bears the burden of justifying a regulation as reasonable in light of the purpose of a limited public forum, even at the preliminary injunction stage. *See Ashcroft*, 542 U.S. at 666. Defendants have offered shifting justifications as to why they were denying the GSA the right to form. As noted above, these justifications are pretextual. *See supra* Section I.C. Even if the Court credits these asserted justifications, they are unconstitutional because none are "reasonable in light of the purpose" of the limited public forum established by KGCS for noncurricular groups.

Defendants have cited "community backlash" as a reason why the GSA cannot form. But community backlash is not a "reasonable" justification for restricting students' speech. *See St. Michael's Media, Inc.* 566 F. Supp. 3d, at 370–71 (holding that attempt to cancel rally based on fear of community backlash constituted impermissible viewpoint discrimination and an unconstitutional heckler's veto, even assuming the pavilion was a limited public forum). For example, in *Boyd*, applying the *Tinker* heckler's-veto doctrine as incorporated into its EAA analysis, the court held that a student protest and school-wide boycott by half the student body were insufficient to justify shutting down a GSA where the student group members themselves did

not cause the disruption. 258 F. Supp. 2d at 674, 689–91. Courts applying that same First Amendment heckler's-veto principle directly to forum-reasonableness analysis have reached the identical conclusion. *See Good News Club*, 533 U.S. at 119 (declining to employ a "modified heckler's veto" as a basis to bar a group's speech in a school district's limited public forum). Here, any disruption supposedly caused by the GSA is far less than the student protest and school-wide boycott at issue in *Boyd*; at most, there have been a number of angry community members providing public comment at Board meetings and a now months old-series of Facebook posts with hundreds of comments, both for and against the club. Thus, Defendants' stated reason for denying the GSA because of community backlash is not a reasonable restriction.

Defendants claim that the GSA is not an "appropriate" topic for middle school students. This rationale rests on the same prejudiced, stereotyped assumption rejected in *Colin*: that a club supporting or discussing LGBTQ+ identity is inherently about sexual content unsuitable for middle schoolers. *See Colin*, 83 F. Supp. 2d at 1147–48 (rejecting the school board's assumption that a GSA would discuss sexual activities as based on a stereotype about LGBTQ+ individuals and recognizing that the actual focus of such groups is not sex, but rather acceptance and how to combat unfair treatment and prejudice). As in *Colin*, Defendants' "inappropriate" label conflates LGBTQ+ identity itself with sexual content, when the GSA's actual mission is to promote respect, understanding, and equality for people of all sexual orientations—not to discuss sex. Likewise, as in *Gonzalez*, where the school board "failed to demonstrate that the GSA's mission to promote tolerance towards individuals of non-heterosexual identity is inherently inconsistent with the abstinence only message [the Board] has adopted," here too Defendants cannot demonstrate the GSA's message includes any age-inappropriate content or is otherwise inherently inappropriate. 571 F. Supp. 2d at 1264. Judging the mere existence of, or support for, LGBTQ+ identity as

"inappropriate" for middle schoolers, without more, reflects the same prejudice the *Colin* court rejected, not any legitimate, content-neutral concern.

Defendants now claim they no longer allow any noncurricular groups at KGMS or KGCS elementary schools. Yet even if Defendants were to begin enforcing this policy against non-GSA student groups, Defendants have long included noncurricular groups in the extracurricular forum. Defendants have not indicated any change in the underlying purpose of the limited public forum for student groups, nor have any facts (other than the GSA's attempted formation) arisen to provide a reason for such a change. Given this long and widespread history of permitting both curricular and noncurricular groups, Defendants cannot demonstrate that it is "suddenly reasonable" under the First Amendment to begin banning noncurricular middle and elementary school groups from this forum. *See Multimedia Pub. Co. of S.C. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 162 (4th Cir. 1993) (finding ban on newspaper racks in airport was not reasonable in limited public forum where "governmental interests asserted as justification for the ban were *post hoc,* pretextual creations"). After all, "[i]f the government could define the contours of a limited public forum one way at [its] inception, then redefine its scope in response to speech it disfavors, the government would be free to zero-in and selectively silence any voice or perspective." *Koala*, 931 F.3d at 903. Such policy change is unreasonable because it has been used to single out the GSA.

**III. Plaintiff Z.J.W. is suffering irreparable harm.**

It is well settled that "the loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This same presumption of irreparable harm has been applied in cases of violations of the Equal Access Act because the act protects "expressive liberties." *Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 872 (2d Cir. 1996) (plaintiff experienced "irreparable injury" by denial for one year of

an after-school Bible group); *Colin*, 83 F. Supp. 2d at 1149–50 (plaintiffs who wanted to form a GSA were irreparably injured by "the inability to effectively address the hardships they encounter at school every day"); *Boyd*, 258 F. Supp. 2d at 692 (plaintiffs suffered irreparable injury by being "unable to meet at school [for already more than three months], unable to benefit from a forum of discussion with other students who are suffering the effects of harassment based on sexual orientation, and unable to work with other students to foster tolerance among all students").

In the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is "inseparably linked" to the likelihood of success on the merits of plaintiff's First Amendment claim. *Newsom v. Albemarle Cnty. Sch. Bd.,* 354 F.3d 249, 254–55 (4th Cir. 2003). This "inseparabl[e] link[]" extends to violations of the EAA. *See Hsu*, 85 F.3d at 856–57. Plaintiff Z.J.W. has suffered the deprivation of a constitutional right because the GSA has not been permitted to form, despite Plaintiff Z.J.W.'s efforts that began nearly a year ago. Throughout that period, Plaintiff Z.J.W. has watched noncurricular student groups at KGMS meet and operate while the GSA alone has been excluded from the forum. Plaintiff Z.J.W. is a rising eighth grader; each month of delay forecloses meaningful opportunity to benefit from the GSA, compounding the irreparable nature of their injury. *Cf. Boyd*, 258 F. Supp. 2d at 692. Plaintiff Z.J.W will continue to suffer by being denied equal access and fair opportunity for the GSA to meet within KGMS.

## IV. Balance of hardships and public interest weigh heavily in favor of Plaintiff Z.J.W.

The balance of equities and public interest factors merge when the government is the defendant. *Vitkus*, 79 F.4th at 368. Injunctions to protect First Amendment rights are always in the public interest. *See Giovani Carandola*, 303 F.3d at 521. Courts have extended this logic to the EAA. *See, e.g.*, *Boyd*, 258 F. Supp. 2d at 692 ("Just as constitutional violations—and by extension Equal Access Act violations—constitute irreparable harm, the exoneration of any such violations would serve to satisfy the public interest requirement.").

These remaining preliminary injunction factors weigh in favor of an injunction. Plaintiff Z.J.W faces irreparable harm and Defendants face none. Here, Plaintiff Z.J.W. faces ongoing harm from the inability to form a constitutionally- and statutorily-protected student group. On the other hand, Defendants can claim no harm resulting from a preliminary injunction given they have allowed noncurricular groups at KGMS for many years and continue to do so to date. Even assuming that enjoining the revised student group policies would result in harm to Defendants, no conceivable harm would outweigh the harm suffered by allowing Plaintiff Z.J.W. to be denied their First Amendment rights. Thus, the balance of hardships strongly weighs in favor of Plaintiff.

The public interest also weighs in favor of Plaintiff Z.J.W. Upholding constitutional rights serves the public interest. *See Giovani Carandola,* 303 F.3d at 521; *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978). And it is in the public interest for school boards to comply with the laws Congress and the Constitution impose on them. Therefore, the requested injunctive relief serves the public interest.

**CONCLUSION**

For the foregoing reasons, Plaintiff Z.J.W respectfully requests that this Court issue the relief requested in Plaintiff's motion.